SOMACH SIMMONS & DUNN, PC
A Professional Corporation
PAUL S. SIMMONS, ESQ. (OSB #971386)
500 Capitol Mall, Suite 1000
Sacramento, CA 95814
Telephone: (916) 446-7979
Facsimile: (916) 446-8199
psimmons@somachlaw.com

Attorneys for Plaintiffs TULELAKE IRRIGATION
DISTRICT; KLAMATH WATER USERS
ASSOCIATION; TALLY HO FARMS
PARTNERSHIP DBA WALKER BROTHERS;
FOUR H ORGANICS, LLC; WOODHOUSE
FARMING AND SEED COMPANY; and
TULELAKE GROWERS ASSOCIATION

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

### MEDFORD DIVISION

| | |
|---|---|
| TULELAKE IRRIGATION DISTRICT; KLAMATH WATER USERS ASSOCIATION; TALLY HO FARMS PARTNERSHIP DBA WALKER BROTHERS; FOUR H ORGANICS, LLC; WOODHOUSE FARMING AND SEED COMPANY; and TULELAKE GROWERS ASSOCIATION, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES FISH AND WILDLIFE SERVICE, an agency in the Department of Interior; RYAN ZINKE, in his official capacity as Secretary of the United States Department of the Interior; JIM KURTH, in his official capacity as Acting Director of the United States Fish and Wildlife Service; and PAUL SOUZA, in his official capacity as Regional Director of the United States Fish and Wildlife Service, Pacific Southwest Region, <br><br> Defendants. | CASE NO. _____ <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Plaintiffs allege as follows:

## INTRODUCTION

1.      This case concerns determinations and actions by the Defendants that are inconsistent with statutory authorities and obligations and unlawfully injure Plaintiffs' interests related to continuation of agricultural production and activities on specific lands within the Klamath Reclamation Project (Klamath Project).  Such determinations and actions relate to public lands reserved for agriculture since 1905 and farmed for generations under unique and productive arrangements.  The "lease lands" are specified areas within the Klamath Project initially reserved for reclamation purposes and intended for homesteading and settlement within the Klamath Project when the states of Oregon and California enacted legislation in 1905 that resulted in ceding the land to the United States.  Unlike other similarly-situated lands in the region committed to reclamation purposes, the lease lands were not homesteaded or otherwise conveyed to private ownership, but were additionally embraced within bird refuges that came to be the Tule Lake National Wildlife Refuge (NWR) and Lower Klamath NWR, with the reservation for birds remaining subject to the underlying reclamation purpose.  These lease lands have continued to be leased for agriculture, as have other agricultural lands on the refuges known as cooperatively farmed lands.

2.      These dual management purposes of agriculture and waterfowl management were made permanent when Congress struck a compromise in legislation known as the "Kuchel Act," Act of September 2, 1964, Pub. L. No. 88-567, 78 Stat. 850.  Congress directed that the current lease lands would not be homesteaded but that the Secretary "shall, consistent with proper waterfowl management, continue the present pattern of leasing the reserved lands."  Thus, waterfowl would continue to benefit from the food and habitat in the agricultural fields as had

been the case for decades; the federal government would retain ownership, prohibiting further homesteading and attendant effects associated with human habitation; and farmers would continue their beneficial agricultural practices, manage the land, and grow crops that benefit both the migrating waterfowl and the surrounding community, including providing revenues for local governments who are entitled to portions of the net lease revenues (rent) paid by growers to the federal government.  The lease lands have been farmed since that time, under a leasing program administered by the U.S. Bureau of Reclamation (Reclamation), which operates under a cooperative agreement with Defendant United States Fish and Wildlife Service ("USFWS" or "Service").  Under that agreement, the refuge lands, including the lease lands, are under the "administrative, responsibility, control and direction" of USFWS, and Reclamation retains certain management responsibility with respect to water and project works of the Klamath Project and conducts the leasing programs in accordance with the requirements in the cooperative agreement and reclamation laws.

3.    Since the adoption of the Kuchel Act in 1964, Congress enacted statutes governing the management of refuge lands within the National Wildlife Refuge System (Refuge System), including the National Wildlife Refuge System Administration Act of 1966, Pub L. No. 89-669, 80 Stat. 926 (Administration Act), as amended by the National Wildlife Refuge System Improvement Act of 1997, Pub. L. No. 105-57, 111 Stat. 1252 (Improvement Act). Pursuant to those laws, in December 2016, Defendant USFWS issued the Final Comprehensive Conservation Plan/Environmental Impact Statement for the Lower Klamath, Clear Lake, Tule Lake, Upper Klamath, and Bear Valley National Wildlife Refuges (Final CCP/EIS). Subsequently, on January 13, 2017, the Regional Director for the Pacific Southwest Region of USFWS signed the Lower Klamath, Clear Lake, Tule Lake, Upper Klamath, and Bear Valley

National Wildlife Refuges: Record of Decision for the Final Comprehensive Conservation Plan/Environmental Impact Statement (ROD), in which the Service stated that it will implement Alternative C for Tule Lake NWR and Alternative C for Lower Klamath NWR, with certain revisions.  Alternative C in the Final CCP/EIS incorporates "compatibility determinations" for the lease lands in Tule Lake NWR and Lower Klamath NWR, and as used herein references to the Final CCP/EIS include the compatibility determinations contained in Appendix G. Compatibility determinations were also adopted for other agricultural lands where the practices known as cooperative farming are conducted.  The compatibility determinations diminish areas devoted to agriculture and impose numerous conditions on agricultural practices on the lease lands that will undermine the ability of lessees to farm the land that can be farmed and reduce crop revenues as well as net lease revenues that are a source of funds to local governments.

4.      The Defendants' actions, findings, and compatibility determinations in the Final CCP/EIS are based on erroneous interpretations or applications of the Kuchel Act and the Improvement Act.  They are not consistent with law, and they are in excess of Defendants' statutory jurisdiction or authority.  The Kuchel Act governs the management of these specific areas that are within the overlapping boundaries of two irrigation districts, the Klamath Project, and Tule Lake NWR and Lower Klamath NWR.  The Kuchel Act, in plain language, mandates that the Secretary continue the then-present pattern of leasing the lease lands for agriculture at "prices designed to obtain the maximum lease revenues" to grow "grain, forage, and soil-building crops" and not more than 25 percent row crops.  The Final CCP/EIS fixes on a phrase in section 4 of the Kuchel Act, "consistent with proper waterfowl management," to find a source of discretion for leasing that does not exist in the statute.  The interpretation of the Kuchel Act in the Final CCP/EIS adopts a reading of section 4 that amounts to: "If he determines that

agriculture on the lease lands is consistent with proper waterfowl management, the Secretary will lease some lands for agriculture, subject to any conditions he subjectively considers necessary at any time, present or future." This approach is not what the statute says. It is inconsistent with the plain language of the Kuchel Act, its context and design, the historical background surrounding its adoption, as well as the current refuge management framework under the Improvement Act.

5.      Further, the Final CCP/EIS does not explicitly recognize that agriculture is a purpose of the Tule Lake and Lower Klamath NWRs, and of the agricultural lands in particular. The establishing documents for both Tule Lake NWR and Lower Klamath NWR reserved these lands for reclamation purposes, and the Kuchel Act continued the original purpose of these lands for reclamation. The Kuchel Act preserves the agricultural purpose.

6.      The Final CCP/EIS does not analyze the environmental effects of the stipulations included in the compatibility determinations, as is required under the National Environmental Policy Act (NEPA). Proposed management changes for agricultural lands will result in fallowing or conversion to non-agricultural use, or non-irrigation of certain lands. The likely effects of this shift in management will be noxious weed growth on fallowed or non-irrigated lands, wind erosion of dry topsoils, as well as detrimental social, and economic effects, all without any benefit to migrating waterfowl. Further, it would be false to assume that less agriculture will result in more water for waterfowl or wetland habitat. Indeed, the approximate is true: less agriculture will result in less water, more noxious weeds, less wetland habitat, and less food resources for waterfowl. The Final CCP/EIS does not analyze these impacts that will occur based on the implementation of the selected alternatives for Tule Lake NWR and Lower Klamath NWR.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                          -5-

7.      Plaintiffs contend that the Defendants' issuance of the Final CCP/EIS and ROD was in excess of statutory jurisdiction or authority, and violated the Kuchel Act, 16 U.S.C. §§ 695k-695r; the Improvement Act, 16 U.S.C. §§ 668dd-668ee; and NEPA, 42 U.S.C. §§ 4321-4335.  Plaintiffs seek relief including as authorized under the Administrative Procedure Act, 5 U.S.C. § 706 (APA).  Plaintiffs seek a declaration that Defendants' issuance of the Final CCP/EIS and ROD was in excess of Defendants' authority and violates these federal statutes, and ask the Court to set aside the Final CCP/EIS and ROD and remand the matter to USFWS to issue a comprehensive conservation plan that is consistent with applicable law.  Plaintiffs also seek a permanent injunction enjoining the implementation or enforcement of stipulations or conditions within the compatibility determination for the lease land program in Tule Lake NWR (Tule Lake Lease Land CD) and the compatibility determination for the lease land program in Lower Klamath NWR (Lower Klamath Lease Land CD).

## JURISDICTION, SOVEREIGN IMMUNITY, AND VENUE

8.      This action involves claims that federal agencies or officers have acted and are acting in a manner inconsistent with law, including the Kuchel Act, the Improvement Act, NEPA, the APA, and other federal law.  The United States has waived sovereign immunity to suit pursuant to 5 U.S.C. § 702.

9.      This action arises under the laws of the United States.  This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

10.      Venue in this Court is proper under 28 U.S.C. § 1391(e).  Officers of the United States and an agency of the United States are Defendants, and USFWS, Pacific Southwest region, maintains an office within this judicial district.  A substantial part of the events giving rise to the claims occurred in this judicial district, and a substantial part of the property that is the

subject of the action is located in this judicial district.

11.    Plaintiffs have exhausted administrative remedies.

12.    The issuance of the Final CCP/EIS and ROD is a final agency action under the APA, 5 U.S.C. § 704.

## PARTIES

13.    Plaintiff Tulelake Irrigation District (TID or District) is a public agency formed and existing pursuant to the Irrigation District Law, California Water Code section 20510 *et seq.* TID provides water delivery and drainage to approximately 65,000 acres of irrigated land in Modoc and Siskiyou Counties, California.  TID diverts and delivers water for irrigation use to both private and federally-owned land in the District and provides drainage for said lands.  The land served by TID includes the Tule Lake lease lands and cooperative farming lands, all of which are located within the boundaries of TID.

14.    TID's objectives and purpose include acquiring and maintaining an assured water supply for irrigated land in the District.  TID's objectives and purpose also include the protection of irrigation and agriculture-related resources in the District, and any actions that adversely affect such resources will injure TID and its water users and customers.  TID also maintains certain lands and facilities whose operation would be impaired by the presence or increase of pests, noxious weeds, or other consequences that could result from idling of lands within the District. TID would also suffer a direct loss of revenue from any reductions of lease revenues from lease lands in the Tule Lake NWR.  TID delivers water to lessees of the lease lands and growers on cooperative lands within Tule Lake NWR.  TID also delivers water to lands that are part of the Walking Wetlands program referenced in the Final CCP/EIS.  Thus, any management directive concerning the delivery of water or operational facility within Tule Lake NWR will necessarily

affect and require the involvement of TID, and may not impose obligations on TID that are not authorized.

15.    Plaintiff Klamath Basin Water Users Protective Association which does business as Klamath Water Users Association (KWUA) is a not-for-profit corporation organized under Oregon law.  Its members include 11 irrigation districts and similar entities in Klamath County, Oregon, and Modoc and Siskiyou Counties, California, who are parties to contracts with Reclamation for delivery of water through Project facilities.  Formed in 1953, KWUA's mission is "to preserve, and enhance the viability of irrigated agriculture for our membership in the Klamath Basin, for the benefit of current and future generations."  Its primary objective is to support agriculture and ensure protection of the water and power for persons in the upper Klamath River Basin and particularly the Project.  The members of the individual districts are farmers and ranchers in the Klamath Basin, including members who farm on the lease lands in Tule Lake NWR and Lower Klamath NWR and the two districts that include Tule Lake NWR and Lower Klamath NWR.  KWUA is also active in environmental and ecosystem restoration efforts in the Klamath River Basin.

16.    Plaintiff Tally Ho Farms Partnership, doing business as Walker Brothers (Walker Brothers) is a farming business based in Malin, Oregon.  The Walker family has been farming since 1972.  Currently, Walker Brothers farms on 2,511 lease land acres in Tule Lake NWR, and 399 lease land acres in "Area K" of Lower Klamath NWR, growing crops such as potatoes, small grains (barley, oats, wheat), and alfalfa hay.  Lease land farming comprises approximately 25 percent of Walker Brothers' business.  Walker Brothers employs approximately 75 full-time employees, ranging from 20 year-round employees to 120 seasonal employees during busy

times.  The Walker family are also avid hunters and birdwatchers in Tule Lake NWR and Lower

Klamath NWR, and take family trips each year to watch the waterfowl on the lease lands.

17.      Plaintiff Four H Organics, LLC (FHO) is a limited liability company co-owned by

Ryan and Jennifer Hartman, with its principal place of business in Malin, Oregon.  The

Hartmans' parents both farmed the lease lands since the 1970s.  The Hartmans started FHO in

2009, and FHO grows organic alfalfa, potatoes, wheat, barley, and hay grass.  Over half of

FHO's farming business takes place on the lease lands, with 1,216 acres in Tule Lake NWR, and

774 acres in Lower Klamath NWR.  Additionally, Ryan Hartman engages in recreational

interests, including hunting and wildlife sightseeing in Tule Lake NWR and Lower Klamath

NWR.

18.      Plaintiff Woodhouse Farming and Seed Company (Woodhouse) is a family

farming business located in Tulelake, California, owned by Terry and Janice Woodhouse, and

managed by their son Walter Woodhouse.  Four generations of the family have farmed in the

Klamath Basin and on the lease lands.  Terry Woodhouse began working his own leases in 1977.

Woodhouse currently farms on over 1,000 acres of lease lands in Tule Lake NWR and Lower

Klamath NWR.  Woodhouse is also one of the largest organic farms in the area.  Woodhouse

employs between 12 and 17 employees per year.  In addition to living and farming in the area,

Walter Woodhouse engages in recreational interests in Tule Lake NWR that include hunting,

photography, sightseeing, and canoeing.

19.      Plaintiff Tulelake Growers Association is an association founded in 1942 and

headquartered in Tulelake, California.  Tulelake Growers Association's purposes include

supporting, promoting, and furthering the interests of local agriculture, farm families, and

agriculture-support businesses.  Tulelake Growers Association's membership includes a large

number of lessees on the Tule Lake NWR lease lands.  Tulelake Growers Association also holds a strong interest in the preservation of agricultural resources, soils, and assets essential to a viable local agricultural community.

20.     Plaintiffs Walker Brothers, Woodhouse, and FHO (collectively, "Growers") also have a continuing interest in the preservation of soils and other resources in the lease lands. Growers each also have an interest in the continued viability of the communities in which they live and the maintenance of the local agricultural economy and culture.

21.     Growers will suffer irreparable injury if they are restricted in their ability to farm the lease lands consistent with ordinary agricultural practices for the region, or if conditions are imposed that go beyond those explicitly identified in section 4 of the Kuchel Act.  Growers will suffer irreparable injury if they must adhere or continue to adhere to new lease terms based on stipulations required by the Final CCP/EIS (including the compatibility determinations). Further, to the extent the existence of new lease terms based on the stipulations results in failure to lease the lease lands, Plaintiffs will suffer irreparable injury due to the loss of crop production, farm income, jobs, and overall effect on the local economy.  In addition, if the acreage of lease lands decreases or the new lease terms are imposed as conditions of new leases and lease renewals, Plaintiff TID will suffer irreparable injury due to loss of net lease revenues.

22.     Plaintiffs will be irreparably injured by any act which directly and indirectly reduces the agricultural acreage of the lease lands or diminishes the ability to farm the land productivity.  Further, Plaintiffs will be irreparably injured by any act which directly and indirectly threatens, causes, results in, or exacerbates the unavailability of water for use on the Tule Lake NWR and Area K lease lands in Lower Klamath NWR.

23.    Defendant USFWS is an agency of the United States government, within the

Department of the Interior, and is the agency charged with administration of laws pertaining to

fish and wildlife.  The Service, its officers, and employees are bound by the laws of the United

States and the contractual obligations of the United States.

24.    Defendant Paul Souza is the Regional Director of the Pacific Southwest Region,

USFWS.

25.    Defendant Jim Kurth is the Acting Director of the USFWS.

26.    Defendant Ryan Zinke is the Secretary of the Department of the Interior.

27.    Defendants Souza, Kurth, and Zinke are sometimes also referred to herein as

"USFWS" or "the Service."

28.    Defendants are bound by, and responsible for the administration of, federal law

and for complying with all laws and legal obligations of the United States.

## GENERAL ALLEGATIONS

### History of the Lease Lands and the Kuchel Act

29.    Irrigated agriculture in the area that is now the Klamath Project began in the

nineteenth century.

30.    In 1902, Congress enacted the Reclamation Act, 32 Stat. 388 (codified at

43 U.S.C. § 371 *et seq.*) (Reclamation Act).  The Reclamation Act encouraged the settlement of

lands in the western states and the development of agricultural economies that feed the nation.

The Reclamation Act provided for federal financing of irrigation works, with the construction

costs to be repaid over time by project water users.

31.    In 1905, the states of Oregon and California enacted statutes to make available

land and water for agricultural development in furtherance of the Reclamation Act.  Oregon

enacted a statute making water available for use in federal reclamation projects.  1905 Or. Laws ch. 228.  This statute provided that whenever the United States files notice of the intent to utilize certain waters in a reclamation project, the water so described is not subject to further appropriation, and, for the purposes of the water rights system, is deemed to be appropriated.  In accordance with this statute, the United States filed, in 1905, notice of appropriation of all waters of the Klamath River Basin for use in the Klamath Project for reclamation uses.  The state of Oregon has, in a general stream adjudication conducted under Oregon Revised Statutes, Chapter 539, confirmed that agricultural irrigation of the lease lands and cooperative lands occurs under water rights vested pursuant to this appropriation.

32.     With respect to the Klamath Project, both the Oregon and California Legislatures enacted laws making state-owned land available for use in the Klamath Project.  The states ceded to the federal government then-submerged land which would be uncovered by reclamation development, for purpose of having the land drained and reclaimed for irrigation use.  The California Cession Act, February 3, 1905 (1905 Cal. Stats. at 4) ceded land to the United States "in pursuance of the provisions of the Reclamation Act of June 17, 1902."  32 Stat. 388, § 2. The Oregon Cession Act also specified that the ceded land may be used by the United States "in pursuance of the provisions of said Reclamation Act."  General Laws of Oregon, 1905, ch. 5 at 63.

33.     The Act of February 9, 1905 ratified those Cession Acts, 33 Stat 714 (codified at 43 U.S.C. § 601), and provides that the federal government may dispose of the state-ceded lands under the terms and conditions of the Reclamation Act.

34.    The Klamath Project was authorized in May of 1905 pursuant to the
1902 Reclamation Act.  The authorized Project purposes are limited and do not include wildlife
purposes.

35.    Lands identified in the state cession acts were drained, reclaimed, and brought
into agricultural use.  Over 65,000 acres of ceded land in California have been brought into
agricultural production since the 1905 Cession Act.  Nearly all of this land is within TID.
Approximately 17,300 acres of land ceded for agricultural purposes which is now within the
Tule Lake NWR is also within TID.  Of this area, approximately 15,000 acres is leased to private
growers, including Growers, for commercial agricultural production, with the acreage varying
somewhat from year to year.  Most of the remainder is currently farmed under crop share
agreements between Defendants and private growers.

36.    On October 4, 1928, Executive Order No. 4975 established the Tule Lake Bird
Refuge.  The Tule Lake Bird Refuge, subsequently named the Tule Lake NWR, includes certain
areas ceded by California to the United States for purposes of the Reclamation Act.  Executive
Order No. 4975 provided: "All of the lands involved have been withdrawn for reclamation
purposes in connection with the Klamath irrigation project, Oregon-California, and are primarily
under the jurisdiction of the Department of the Interior.  The reservation of these lands as a bird
refuge is subject to the use thereof by said Department for irrigation and other incidental
purposes, and to any other valid existing right."  Executive Order No. 5945, Tule Lake Wild Life
Refuge, California (November 3, 1932), which superseded Executive Order No. 4975, used the
same limiting language.  Finally, Executive Order No. 7341, Enlarging Tule Lake Wildlife
Refuge, California (April 10, 1936) provides that the "lands herein reserved have been
withdrawn or were purchased for reclamation purposes in connection with the Klamath Irrigation

Project, and are primarily under the jurisdiction of the Department of the Interior.  The reservation of these lands as a wildlife refuge is subject to the use thereof by said Department for reclamation purposes . . . ."

37.     On August 9, 1908, Executive Order No. 924 reserved and set aside "all islands situated in . . . and the marsh and swamp lands unsuitable for agricultural purposes" within Lower Klamath Lake area as a bird preserve to be known as the Klamath Lake Reservation.  This executive order, "[was] made subject to and [was] not intended to interfere with the use of any part of the reserved area by the Reclamation Service acting under the provisions of the [Reclamation Act] approved June 17, 1902, or any subsequent legislation."  The executive order generally made it unlawful to take or kill birds or bird eggs within the reservation boundary.  Subsequent Executive Orders No. 2200 (May 14, 1915), No. 3187 (December 2, 1919), No. 3422 (March 28, 1921), and No. 8475 (July 10, 1940) further modified the boundaries of the Lower Klamath Lake Reservation.

38.     At the time of Executive Order No. 924, the degree to which many lands were suitable for agricultural use had not yet been determined.  Due to the persistence of local landowners, including the formation of the Klamath Drainage District (KDD) on March 6, 1915, much of the Lower Klamath Lake area in Oregon was eventually made feasible for the cultivation of crops.  KDD was organized under the laws of the state of Oregon to drain and reclaim all lands within the district.  On November 30, 1917, the United States and KDD entered into a contract providing for the reclamation of lands in and around Lower Klamath Lake.

39.     The majority of the lands within KDD are privately owned.  A section of land, known as "Area K" and generally located in the southern part of the district below Township Road, is owned by the United States and within Lower Klamath NWR.  The lands within Area K

consist of approximately 6,000 acres and were uncovered and reclaimed due to the effort of KDD and at great expense.

40.     The initial understanding during development of the Klamath Project was that the Area K lands would eventually be transferred to private ownership.  These lands were included as part of the district's initial reclamation plan, and through subsequent years, requests were repeatedly made to privatize these lands in accordance with the original intent.

41.     The Area K lands had been in agricultural production long before the Kuchel Act. The Area K lands are part of KDD, and utilize the irrigation and drainage facilities of the district like any other landowner.  The United States and KDD entered into several agreements and contract amendments and revisions following the execution of the original contract in 1917, which include provisions related to the Area K lease lands.  Area K lands are treated in the same manner as other lands in the district.

42.     The leasing by the United States of lands in the Tule Lake Basin ceded for agriculture began by 1916.  The area of lease lands grew as ceded lands became suitable for farming.  At the same time, homesteading was occurring, which removed land from the leasing program.  In the early 1940s, the number of acres leased in the Tule Lake division of the Klamath Project was approximately 43,000 acres.  After World War II, additional lands had been opened for homesteading, with a preference given to war veterans.  The acreage of lease lands decreased to its current level by the end of the 1940s, as a result of the last homesteading of lease lands.

43.     A January 8, 1942 agreement between Reclamation and USFWS regarding development and operation of the Modoc Unit of the Klamath Project in relation to the Tule Lake, Lower Klamath, and Clear Lake NWRs (1942 Agreement), divided the functions and

obligations of Reclamation and USFWS with respect to the Modoc Unit in the Tule Lake area and elsewhere.  The 1942 Agreement reiterates that the Executive Orders:

> [P]rovide that the lands covered thereby are subject to the use of the lands for irrigation and other incidental purposes; and the government lands affected by this agreement are lands withdrawn or acquired under the [Reclamation] Act . . . and held primarily for reclamation uses.

44.    The 1942 Agreement was amended in 1946 and 1966.  The 1942 Agreement was renewed in a "Cooperative Agreement" in 1977.  The 1977 Cooperative Agreement between USFWS and Reclamation generally provided that USFWS would have ultimate administrative control over the lands identified in the Kuchel Act and that Reclamation would actually conduct the program of leasing the lease lands.

45.    In 1956, TID entered into a contract with the United States, Contract No. 14-06-200-5954 (TID Contract).  The TID Contract was specifically authorized by the Act of August 1, 1956, 70 Stat. 799.  The TID Contract provided for the transfer of operation and maintenance of certain Klamath Project facilities to TID, and required TID to repay a portion of the construction costs of the Klamath Project.  TID has fully repaid this obligation.  The TID Contract also requires TID to reimburse Reclamation for the costs of operation and maintenance of certain facilities still operated by Reclamation.  Under article 33 of the TID Contract, TID agreed to deliver water for irrigation, and drainage service, to any lands within the District owned or under control of the United States.  The United States is obliged to reimburse TID for the cost of operation and maintenance of works involved in such services.  Under current practices, leases with growers provide that the growers will pay such charges directly to TID.

46.    Pursuant to article 4 of the TID Contract, TID is entitled to a portion of lease revenues paid to the United States by lessees of lease lands within the Tule Lake NWR.  TID is currently entitled to 10 percent of net lease revenues annually.

47.     Article 8 of the TID Contract provides that the approximately 2,500 acres in Tule Lake NWR presently farmed by the United States will not be increased during the term of the TID Contract.  The United States may shift the acreage, and committed to conducting feasibility studies to identify substitute wildlife habitat that could be developed in other areas of the Klamath Basin.

48.     At the time of entering the TID Contract, the United States was giving consideration to making lease lands within the Tule Lake NWR available to private persons for homesteading purposes.  The United States did not make any decision as to homesteading at that time.  However, section 4 of the Act of August 1, 1956, 70 Stat. 799 provided that: "[T]he Secretary shall . . . continue the leasing of public lands to provide adequate funds for the purposes of this Act and the [TID] contract."  In addition, section 4 of the TID Contract provided for payments to TID from the net revenues paid by lessees to the United States.  Currently, TID is entitled to 10 percent of the net lease revenues.  In addition, certain net lease revenues beyond those paid to TID and counties were accounted as capital payments toward obligations of the Tule Lake Division of the Klamath Project.

49.     In 1964, Congress enacted the Kuchel Act.  Section 2 of the Kuchel Act precluded the homesteading of lands owned by the United States lying within the executive order boundaries of Tule Lake NWR, Lower Klamath NWR, Upper Klamath NWR, and Clear Lake NWR, including the lease lands in Tule Lake NWR and Lower Klamath NWR.  Section 2 further provided that lands within these refuges shall be administered for the major purpose of waterfowl management with full consideration to optimum agricultural use that is consistent therewith.

50.     Section 4 of the Kuchel Act provides:

The Secretary shall, consistent with proper waterfowl management, continue the present pattern of leasing the reserved lands of the Klamath Straits unit, the

Southwest Sump, the League of Nations unit, the Henzel lease, and the Frog Pond unit, all within the Executive order boundaries of the Lower Klamath and Tule Lake National Wildlife Refuges and shown in plate 4 of the report entitled "Plan for Wildlife Use of Federal Lands in the Upper Klamath Basin, Oregon-California," dated April 1956.  Leases for these lands shall be at a price or prices designed to obtain the maximum lease revenues.  The leases shall provide for the growing of grain, forage, and soil-building crops, except that not more than 25 per centum of the total leased lands may be planted to row crops.  All other reserved public lands included in section 2 of this Act shall continue to be managed by the Secretary for waterfowl purposes, including the growing of agricultural crops by direct planting and sharecrop agreements with local cooperators where necessary.

51.    Section 3 of the Kuchel Act, 16 U.S.C. § 695m, provided that counties within which the lease lands lie shall receive 25 percent of net lease revenues as payments in lieu of taxes, and additionally established or recognized certain obligations to TID and KDD for payment of net lease revenues.

52.    Pursuant to Reclamation law, the Act of August 1, 1956, the Kuchel Act, the lease lands within the Tule Lake NWR and Lower Klamath NWR have been leased to private producers for agricultural purposes for many decades, and for a century in the case of certain lands.

53.    Under the current lease land program, farmers desiring to enter leases are required to submit sealed bids for such leases prior to the growing season, and leases are awarded based on the bids.  Farmers awarded a lease also obtain rights of renewal for a subsequent period of years, with the number of potential renewal years generally dependent on certain factors such as crop type and method of production.

54.    The gross revenue (rent) paid by private growers to Defendants for the lease lands in the Tule Lake NWR was approximately $5.2 million in 2015.  Net lease revenue (gross revenues less expenses) was approximately $4.9 million in 2015.  Thus, in 2015, the lease land program resulted in a payment to TID of approximately $490,000, or 10 percent of net lease

revenues.  Lessees are also required in their leases to pay water charges to TID as well as the other costs of farming.  The direct farm income from the lease lands within TID was $27.7 million in 2011 and $24.5 million in 2012.  Additionally, the Final CCP/EIS provides the following estimates for economic benefits of existing agricultural crop production in Tule Lake NWR in 2015: $56,235,496 in total agricultural output, $12,369,179 in total employment compensation, and 574.8 jobs.

55.     With respect to Lower Klamath NWR, the Final CCP/EIS provides the following estimates for economic benefits of existing agricultural crop production in 2015:  $747,558 in grain sales with water deliveries based on a 0.2 percentile year, $4.485,348 in grain sales with water deliveries based on a 0.8 percentile year, between $354,981 and $2,129,885 in total employment compensation depending on water deliveries, and between 14.0 and 83.9 jobs depending on water deliveries.  These estimates do not reflect all of the economic value.

56.     The lease lands play a critical role in many farmers', including Growers', ability to farm and make a living.  In addition, farmers that do not have the financial ability to buy private farmland are able to lease lands, grow crops, and begin their businesses.  Moreover, because the lease lands also serve the purpose of waterfowl conservation and optimum agricultural production, they have been used to explore and develop the safest, wildlife-friendly farming practices.  Agricultural scientists, wildlife scientists, conservationists, and farmers work together to define and develop wildlife friendly farming practices on lease lands involving high yield agriculture including row crops.

## Other Applicable Laws

57.     The APA provides that reviewing courts shall hold unlawful and set aside agency action, findings, and conclusions found to be: arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law; contrary to constitutional rights; or in excess of statutory authority, short of statutory right, or without observance of procedure required by law.  5 U.S.C. § 706.

58.     NEPA requires that federal agencies prepare an environmental impact statement for "major Federal actions significantly affecting the quality of the human environment." 43 U.S.C. § 4332(2)(C).  An environmental impact statement must contain a detailed statement on: the underlying purpose and need to which the agency is responding; the proposed action and a reasonable range of alternatives to the proposed action; the environmental impacts of the alternatives and proposed action; and any adverse environmental effects which cannot be avoided should the proposal be implemented.  43 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1502.13, 1502.14.

59.     As part of the environmental impact statement, federal agencies must present the proposed action and a reasonable range of alternatives.  40 C.F.R. § 1502.14(a).  Federal agencies must "[d]evote substantial treatment to each alternative considered in detail including the proposed action . . . ."  40 C.F.R. § 1502.14(b).

60.     The environmental impact statement must serve as the means of assessing the environmental impact of proposed agency actions, rather than justifying decisions already made," 40 C.F.R. § 1502.2(g), and provide a "full and fair discussion of significant environmental impacts," 40 C.F.R. § 1502.1.  Specifically, for each alternative, including the proposed action, an environmental impact statement must discuss direct effects, indirect effects, and cumulative impacts.  40 C.F.R. §§ 1502.15, 1508.7, 1508.8.

61.     After preparing the environmental impact statement, the agency must prepare a public record of decision (ROD), stating what its decision was, identifying the alternatives

considered by the agency and which alternatives were considered environmentally preferable, and stating whether all practicable means to avoid or minimize environmental harm from the selected alternative have been adopted.  40 C.F.R. § 1505.2.

62.    The Administration Act consolidated various authorities governing wildlife and waterfowl refuge areas into the Refuge System.  The Improvement Act amended the Administration Act, provided certain management mandates for the Refuge System, and required USFWS to prepare "comprehensive conservation plans" for each refuge or refuge complex.

63.    A comprehensive conservation plan is a "document that describes the desired future conditions of a refuge or planning unit and provides long-range guidance and management direction to achieve the purposes of the refuge," to "fulfill the mission of the Refuge System," and to "meet other mandates."  50 C.F.R. § 25.12.  In each comprehensive conservation plan, USFWS must identify the "purposes" of each refuge.  16 U.S.C. § 668dd(e)(2)(A).  "Purposes of the refuge" is defined as the "purposes specified in or derived from the law, proclamation, executive order, agreement, public land order, donation document, or administrative memorandum establishing, authorizing, or expanding a refuge, refuge unit, or refuge subunit." 16 U.S.C. § 668ee(10); *see also* 50 C.F.R. § 25.12.  The USFWS's Service Manual also includes a section on refuge purposes and "provides guidance for identifying or determining the purposes(s) of each refuge in the Refuge System."

64.    The Improvement Act also carried forward a "compatibility" concept from section 4(d) of the Administration Act.  Subject to identified exceptions, the Secretary "shall not initiate or permit a new use of a refuge or expand, renew, or extend an existing use of a refuge, unless the Secretary has determined that the use is a compatible use . . . ."  16 U.S.C. § 668dd(d)(3)(A)(i).  A "compatible use" is a "wildlife-dependent recreational use or any other

use of a refuge that, in the sound professional judgment of [USFWS], will not materially

interfere with or detract from the fulfillment of the mission of the [Refuge] System or the

purposes of the refuge."  16 U.S.C. § 668ee(1); *see also* 50 C.F.R. § 25.12.  USFWS regulations

include guidelines and procedures for making compatibility determinations, and USFWS may

make compatibility determinations for a refuge or planning unit "concurrently with" the

development of a comprehensive conversation plan.  16 U.S.C. § 668dd(d)(3)(A)(i).

### Final CCP/EIS

65.    The Klamath Basin National Wildlife Refuge Complex (Klamath Refuge

Complex) consists of six different refuges: Bear Valley NWR; Upper Klamath NWR; Klamath

Marsh NWR; Tule Lake NWR; Lower Klamath NWR; and Clear Lake NWR.  USFWS

completed the comprehensive conservation planning process for Klamath Marsh NWR in 2010.

USFWS released a draft comprehensive conservation plan/environmental impact statement for

the remaining five refuges in the Klamath Refuge Complex in May 2016.  Following a period for

public comment, USFWS issued the Final CCP/EIS in December 2016.

66.    For Tule Lake NWR, the Final CCP/EIS identifies the following purposes of the

refuge: ". . . as a refuge and breeding ground for birds . . ."; ". . . as a refuge and breeding ground

for wild birds and animals"; ". . . to preserve intact the necessary existing habitat for migratory

waterfowl in this vital area of the Pacific flyway . . ."; ". . . to prevent depredations of migratory

waterfowl on the agricultural crops in the Pacific Coast States"; ". . . dedicated to wildlife

conservation . . . for the major purpose of waterfowl management, but with full consideration to

optimum agricultural use that is consistent therewith"; for certain designated lease land units,

". . . consistent with proper waterfowl management, continue the present pattern of leasing the

reserved lands . . ."; and for lands other than lease lands, ". . . for waterfowl purposes, including

the growing of agricultural crops by direct plantings and sharecrop agreements with local

cooperators where necessary . . . ."

67.    The Final CCP/EIS included, as Appendix M, a document titled "The Kuchel Act

and Management of Lower Klamath and Tule Lake National Wildlife Refuges" (Kuchel Act

Paper).  The Kuchel Act Paper included an interpretation of the Kuchel Act upon which the

Service relied in formulating the Final CCP/EIS.  The Kuchel Act Paper defined the phrase

"proper waterfowl management," as it is used in section 4 of the Kuchel Act, to mean:

> Providing habitats sufficient to support waterfowl population objectives
> throughout the annual cycle while promoting the highest possible natural
> biological diversity of refuge habitats.  A sufficient quantity and diversity of
> foraging resources should be provided that will meet the energy requirements and
> nutritional demands of all waterfowl species.  Where feasible, natural foods
> should be given priority over agricultural crops.

The Service thus interpreted the Kuchel Act's mandates to continue the "present pattern of

leasing," maximize lease revenues, and optimize agriculture to mean the Service may only

maintain the lease lands program on Tule Lake NWR and Lower Klamath NWR to the extent

lease land agriculture is "consistent with" a present-day definition of proper waterfowl

management.  Thus, the Service determined that for the present pattern of leasing to be

consistent with proper waterfowl management, "the overall program must provide sufficient food

resources to support population objectives for waterfowl (dabbling ducks and geese) during the

spring and fall migration," and "post-harvest farming practices and other practices must be

implemented that will increase the attractiveness of the fields for foraging waterfowl and

disperse waterfowl use as widely in the lease lands as possible."

68.    In developing alternatives for the management of Tule Lake NWR, the Service

applied the interpretation of the Kuchel Act in Appendix M of the Final CCP/EIS; its water

availability analysis based on the March 7, 2013 Findings of Fact and Final Order of

Determination issued by the Oregon Water Resources Department; waterfowl population objectives set forth in the document titled "A Bioenergetics Approach to Conservation Planning for Waterfowl at Lower Klamath and Tule Lake National Wildlife Refuges" (Bioenergetics Model) in Appendix N; and the purposes of the refuge that the Service articulated.

69.     For the Agricultural Habitat Management component of the comprehensive conservation plan, the Final CCP/EIS lists Alternative A as the No Action Alternative.  Under Alternative A, the Service would continue the lease land program, lease approximately 14,800 acres on 168 lots in the "Southwest sump, the League of Nations unit, the Henzel lease, and the Frog Pond unit . . . ," limit the amount of leased acreage planted to row crops to 25 percent (the percentage applies to the combined acreage of lease lands in Tule Lake and Lower Klamath NWRs), and lease the 168 lots through a competitive bidding process to obtain the maximum lease revenues.  With respect to the cooperative farming program, under Alternative A, the Service would continue to maintain up to 2,500 acres of cooperatively farmed crops and wetlands under crop share agreements under which 25-33 percent of grains would be left as standing grain.  Alternative A calls for an average of 1,100 acres of walking wetlands on the lease lands and cooperative farm lands and the completion of construction of dikes around lease land lots in Sump 3 where walking wetland management is feasible.

70.     As Alternative B for the Agricultural Habitat Management component, the Service would require Reclamation to obtain a Special Use Permit (SUP) annually that contains stipulations for the lease land program, and require that the stipulations be implemented in new leases.  Acreage of unharvested grain would increase from 1,100 acres to 1,500 acres, with 750 acres occurring on the lease lands and the other 750 acres occurring on the cooperative farm lands.  Additionally, Alternative B requires that 2,700 acres of harvested potatoes and

3,400 acres of green browse (i.e., alfalfa, hay, or fall planted small grains) be available as forage for waterfowl.  The acreage and interspersion of walking wetlands would increase to a minimum of 1,380 acres, and the Service and Reclamation would strive to ensure that all agricultural fields are within one mile of wetland habitat.  The Service would periodically evaluate the lease land program to ensure agricultural food resources are sufficient to support the waterfowl population objectives.

71.     The Final CCP/EIS lists Alternative C as the preferred alternative for Tule Lake NWR.  Alternative C for Agricultural Habitat Management includes all the actions and stipulations under Alternative B.  Additionally, the Service would periodically evaluate its cooperative agreement with Reclamation to determine if revisions are necessary.  The Service would also require an increased number of fields to be pre-irrigated (i.e., fall flooding).

72.     As part of the Final CCP/EIS, the Service issued a compatibility determination for the Lease Land Farming Program in Tule Lake NWR (Tule Lake Lease Land CD).  The Lease Land CD describes agriculture as an "economic use" of Tule Lake NWR subject to the compatibility standard in the Improvement Act.  The Service interpreted both the Improvement Act and the Kuchel Act and concluded that the term "consistent therewith" in the Kuchel Act has the same meaning as "compatible" under the Improvement Act.  The Service applied its Compatibility Policy to determine whether the lease land farming program in Tule Lake NWR is "compatible and 'consistent' with the primary purposes for which the refuge was established."

73.     In the Tule Lake Lease Land CD, the Service found that the lease land program is "compatible with the following stipulations."  The stipulations include requirements for food resources, habitat management, pest management, farming practices, and annual review of the lease land program.  In addition, specific requirements for agricultural practices include, but are

not limited to: flooding post-harvest to February 15 at the Service's discretion; limiting fall tillage subject to the Service's approval; prohibiting field work from post-harvest until February 15 unless authorized by the Refuge Manager; prohibiting hazing of waterfowl from January 1 until April 30; and presumptively prohibiting the use of genetically modified crops/organisms on the refuge.  These stipulations would or may reduce agricultural acreage and increase the number of unharvested acres of land that remain in agriculture, as well as impair the ability to productively farm on the lease lands.  Lease land contracts must contain all of the stipulations listed in the Tule Lake Lease Land CD.  Reclamation must also apply each year for a SUP that will include the stipulations and the prescribed habitat mix based on energetic modeling.

74.     Alternatives B and C for Agricultural Habitat Management for Tule Lake NWR incorporate all of the stipulations contained in the Tule Lake Lease Land CD.

75.     The Service included a "Finding of Appropriateness of a Refuge Use" for lease land farming on Tule Lake NWR, dated November 2, 2015, in the Final CCP/EIS.  The Service concluded that lease land farming is an appropriate use in Tule Lake NWR.

76.     For Lower Klamath NWR, the Final CCP/EIS identifies the following purposes of the refuge: ". . . as a preserve and breeding ground for native birds . . ."; ". . . protection of native birds"; ". . . to preserve intact the necessary existing habitat for migratory waterfowl in this vital area of the Pacific flyway . . ."; ". . . to prevent depredations of migratory waterfowl on the agricultural crops in the Pacific Coast States"; ". . . dedicated to wildlife conservation . . . for the major purpose of waterfowl management, but with full consideration to optimum agricultural use that is consistent therewith"; ". . . consistent with proper waterfowl management, continue the present pattern of leasing the reserved lands . . ."; ". . . for waterfowl purposes, including the

growing of agricultural crops by direct plantings and sharecrop agreements with local

cooperators where necessary . . . ."; and ". . . for use as an inviolate sanctuary, or for any other

management purposes, for migratory birds."

77.     Lease land farming occurs in Area K of the Lower Klamath NWR.  Area K has

43 individual lots, between 102 to 160 acres in size, for a total of 5,605 irrigated acres.  No row

crops are grown in the Area K lease lands – only small grains.  The Service also manages a

cooperative farming program in Lower Klamath NWR under which farmers leave standing grain

(25-33 percent of crop) for waterfowl use.

78.     Alternative A – the No Action Alternative – for Agricultural Habitat Management

in Lower Klamath NWR would continue the current management program for agriculture, and

total farmed acres in years when water is available would amount to 9,600 acres, composed of

7,600 acres of grain and 2,000 acres of pasture.

79.     As Alternative B for Agricultural Habitat Management in Lower Klamath NWR,

lease land and cooperative farming would continue, and the Service would require Reclamation

to obtain a SUP annually that includes stipulations and prescribed mixtures of habitat types based

on the Bioenergetics Model.  The Service would increase the acreage of unharvested

cooperatively farmed grain by 500 acres.  Subject to water availability, an additional 2,000 acres

of harvested grain would be converted to pasture/green browse, with approximately 700 acres

coming from the cooperatively farmed lands and the remaining 1,300 acres coming from the

Area K lease lands grain fields.

80.     The Final CCP/EIS lists Alternative C as the preferred alternative for Lower

Klamath NWR.  Under Alternative C, Agricultural Habitat Management in Lower Klamath

NWR would be the same as in Alternative B, except that the amount of unharvested grain would

be increased by 1,500 acres.  If this habitat objective cannot be met on the cooperatively farmed lands, the lease land contract holders in Area K would be required to leave 25 percent of their field as unharvested standing grain until this habitat objective is met.

81.    Alternative D for Agricultural Habitat Management in Lower Klamath NWR is the same as Alternative C.

82.    The Service also issued a compatibility determination for the lease land farming program in Lower Klamath NWR (Lower Klamath Lease Land CD).  In the Lower Klamath Lease Land CD, the Service similarly interpreted the Kuchel Act and the Improvement Act and concluded that the term "consistent therewith" in the Kuchel Act has the same meaning as "compatible" under the Improvement Act.  The Service applied its Compatibility Policy to determine whether the lease land farming program in Lower Klamath NWR is "compatible and 'consistent' with the primary purposes for which the refuge was established."  The Lower Klamath Lease Land CD contains the same stipulations as the Tule Lake Lease Land CD and similarly requires that the lease land contracts contain all of the stipulations listed in the Lower Klamath Lease Land CD.

83.    Alternatives B, C, and D for Agricultural Habitat Management for Lower Klamath NWR incorporate all of the stipulations contained in the Lower Klamath Lease Land CD.

84.    The Service included a "Finding of Appropriateness of a Refuge Use" for lease land farming on Lower Klamath NWR, dated November 3, 2015, in the Final CCP/EIS.  The Service concluded that lease land farming is an appropriate use in Lower Klamath NWR.

85.     Chapter 6 of the Final CCP/EIS purportedly analyzes the effects of the management alternatives on physical, natural, cultural, and socioeconomic resources at the Klamath Refuge Complex.

86.     On January 13, 2017, Defendant Souza, the Regional Director for the Pacific Southwest Region of USFWS, signed the ROD.

87.     In the ROD, USFWS stated that it will implement Alternative C for Tule Lake NWR, with the revisions noted in the summary of and responses to comment letters on the Final CCP/EIS, included as Appendix B to the ROD.

88.     In the ROD, USFWS stated that it will implement Alternative C for Lower Klamath NWR, with the revisions noted in the summary of and responses to comment letters on the Final CCP/EIS, included as Appendix B to the ROD.

## FIRST CLAIM FOR RELIEF

### (Administrative Procedure Act—Violation of Kuchel Act / Actions in Excess of Statutory Jurisdiction or Authority)

89.     Plaintiffs reallege and incorporate by reference paragraphs 1-88 of this Complaint.

90.     Section 2 of the Kuchel Act, 16 U.S.C. § 695l, precludes the homesteading of the lease lands within Tule Lake NWR and Lower Klamath NWR and provides that the lands within the boundaries of various refuges including Tule Lake NWR and Lower Klamath NWR are dedicated to the major purpose of waterfowl management but with full consideration to "optimum agricultural use that is consistent therewith."

91.     Section 4 of the Kuchel Act, 16 U.S.C. § 695n, in furtherance of this objective, provides, with respect to the lease lands, that the Secretary of the Interior shall continue the present pattern of leasing, with specified stipulations on management of the lease lands.

Section 4 further provides that leases shall be at prices to obtain the maximum lease revenues. Section 4 further provides that lands within Tule Lake NWR and Lower Klamath NWR *other than* the lease lands shall be managed for waterfowl purposes.

92.     Section 6 of the Kuchel Act, 16 U.S.C. § 695p, provides that waters under control of the Secretary shall be regulated subject to valid existing rights.  The purpose of this provision is, *inter alia,* to recognize the existing rights to water for irrigation use in TID and other rights in the TID Contract as well as rights of other Klamath Project contractors.

93.     The Final CCP/EIS and ROD violate the mandate in the Kuchel Act that the Secretary "continue the present pattern of leasing . . ." in the designated refuge land units.

94.     Alternative C for Agricultural Habitat Management in Tule Lake NWR and Alternative C for Agricultural Habitat Management in Lower Klamath NWR incorporate the stipulations and restrictions on lease land farming in the Tule Lake Lease Land CD and Lower Klamath Lease Land CD, respectively.  These stipulations and restrictions on lease land farming will have the effect of reducing agricultural acreage in Tule Lake NWR in contravention of the mandate in section 4 of the Kuchel Act to "continue the present pattern of leasing . . . ."

95.     The Final CCP/EIS and ROD rely on an approach to the Kuchel Act under which the lease land program in Tule Lake NWR and Lower Klamath NWR can continue only if the Service determines that lease land agriculture is consistent with proper waterfowl management. The Kuchel Act does not require a consistency determination.  Rather, the Kuchel Act commands the Secretary to take a specific action: to continue leasing agricultural lands in specific project areas, subject to certain conditions explicitly stated in section 4 of the Kuchel Act.  The Final CCP/EIS has turned this direct mandate into a standard that gives the Secretary discretion with respect to the amount of leased acreage, the cropping patterns, the pricing of

leases, and other agricultural management practices on the lease lands.  This interpretation is in contravention to the plain language of the statute, the context of the language and design of the statute as a whole, and the intent of Congress with respect to lease land farming in Tule Lake NWR and Lower Klamath NWR.  In addition, certain water management activities identified in the Final CCP/EIS and ROD would or may require action by TID or KDD but cannot be imposed on TID or KDD without their agreement.

96.     Thus, the Final CCP/EIS and ROD are not in accordance with the mandates of the Kuchel Act and violate 5 U.S.C. § 706.  In the alternative, the Final CCP/EIS and ROD constitute actions in excess of Defendants' statutory jurisdiction or authority.

97.     Defendants' issuance of the Final CCP/EIS and ROD is arbitrary, capricious, an abuse of discretion, and not in accordance with law, and must be set aside.

<u>**SECOND CLAIM FOR RELIEF**</u>

**(Administrative Procedure Act—Violation of Improvement Act /
Actions in Excess of Statutory Jurisdiction or Authority)**

98.     Plaintiffs reallege and incorporate by reference paragraphs 1-97 of this Complaint.

99.     Defendants' Tule Lake Lease Land CD and Lower Klamath Lease Land CD, described in paragraphs 72, 73, and 82, purport to be a determination of compatibility or consistency pursuant to the Improvement Act, the Kuchel Act, or both.

100.     The California and Oregon Cession Acts, under which land was ceded to the United States, conditioned the cession and future disposal of the land on "pursuance" of the provisions of the Reclamation Act, and Congress authorized the disposition of ceded lands or other lands for reclamation purposes.

101.     The authorization of the Klamath Project in 1905 reserved the lands that are now within the boundaries of Tule Lake NWR and Lower Klamath NWR for reclamation purposes.

102.     Executive Order Nos. 4975, 5945, and 7341 reserved the lands that are now within the boundaries of the Tule Lake NWR as refuge areas subject to the original purpose and reservation of the lands for reclamation.

103.     Executive Order Nos. 924, 2200, 3187, 3422, and 8475 reserved the lands that are now within the boundaries of the Lower Klamath NWR as refuge areas subject to the original purpose and reservation of the lands for reclamation.

104.     Congressional authorization of the TID Contract in 1956 confirmed the intent of Congress to continue the reclamation purpose of the lands within TID and within the boundaries of Tule Lake NWR.

105.     The Kuchel Act continued the reclamation purpose of the lands within Tule Lake NWR and Lower Klamath NWR.  Express language in the Kuchel Act refers to the Klamath Project and the reclamation purpose of lands within Tule Lake NWR and Lower Klamath NWR. Further, the Kuchel Act did not revoke or modify the existing reservation of the lands for reclamation purposes.

106.     The applicable authorities and establishing documents for Tule Lake NWR and Lower Klamath NWR respectively establish that agriculture is a purpose of Tule Lake NWR and Lower Klamath NWR.  The Final CCP/EIS, in part, recognizes that agriculture and reclamation are purposes of Tule Lake NWR and Lower Klamath NWR.

107.     As a purpose of the refuges, under the Improvement Act, there is no requirement or authority to determine compatibility of agriculture with other purposes of the refuges. "Compatibility" is only a standard for a "use" of the refuge, and a compatibility determination is

only required to evaluate whether a use of the refuge will or will not materially interfere with or detract from the purposes of the refuge.  The treatment of agriculture on the lease lands and cooperative farm lands in Tule Lake NWR and Lower Klamath NWR as a "use" under the Improvement Act and evaluation of agriculture under the USFWS Compatible Use Policy and USFWS Appropriate Use Policy is inconsistent with the regulatory status of agriculture as a "purpose" of Tule Lake NWR and Lower Klamath NWR.

108.    In addition, certain water management activities identified in the CDs for agricultural lands would or may require action by TID or KDD but cannot be imposed on TID or KDD without their agreement.

109.    Because agriculture is a purpose of Tule Lake NWR and Lower Klamath NWR lands identified in section 4 of the Kuchel Act, with agriculture conducted on a subset of such lands, USFWS must evaluate whether uses, such as hunting, boating, and wildlife observation photography, on that subset of Tule Lake NWR and Lower Klamath NWR are compatible with agriculture.

110.    Thus, the Tule Lake Lease Land CD and Lower Klamath Lease Land CD are not in accordance with the Improvement Act and violate 5 U.S.C. § 706.  In the alternative, the Tule Lake Lease Land CD and Lower Klamath Lease Land CD constitute actions in excess of Defendants' statutory jurisdiction or authority.

111.    Defendants' issuance of the Tule Lake Lease Land CD and Lower Klamath Lease Land CD is arbitrary, capricious, an abuse of discretion, and not in accordance with law, and must be set aside

112.    For the same reasons, the compatibility determinations for the cooperative farm program in Tule Lake NWR and Lower Klamath NWR are not in accordance with the

Improvement Act and violate 5 U.S.C. § 706.  In the alternative, the compatibility determinations for the cooperative farm program in Tule Lake NWR and Lower Klamath NWR constitute actions in excess of Defendants' statutory jurisdiction or authority.

113.    Defendants' issuance of the compatibility determinations for the cooperative farm program in Tule Lake NWR and Lower Klamath NWR is arbitrary, capricious, an abuse of discretion, and not in accordance with law, and must be set aside.

## THIRD CLAIM FOR RELIEF

### (Administrative Procedure Act— Violation of Improvement Act / Actions in Excess of Statutory Jurisdiction or Authority)

114.    Plaintiffs reallege and incorporate by reference paragraphs 1-113 of this Complaint.

115.    Defendants' Tule Lake Lease Land CD and Lower Klamath Lease Land CD, described in paragraphs 72, 73, and 82, purport to be a determination of compatibility or consistency pursuant to the National Wildlife Refuge System Administration Act, as amended, 16 U.S.C. § 668dd, the Kuchel Act, 16 U.S.C. § 695k *et seq.,* or both.

116.    A "compatible" use is a "wildlife-dependent recreational use or any other use of a refuge that, in the sound professional judgment of [USFWS], will not materially interfere with or detract from the fulfillment of the mission of the [Refuge] System or the purposes of the refuge." 16 U.S.C. § 6688ee(1); 50 C.F.R. § 25.12.

117.    A compatibility determination must conclude whether the use is compatible and include a "logical explanation describing how the proposed use would, or would not, materially interfere with or detract from the fulfillment of the Refuge System or the purpose(s)" of the refuge.  50 C.F.R. § 26.41(a)(10), (12).

118.    Assuming that agriculture is a use of the lease lands, the Tule Lake Lease Land CD and the Lower Klamath Lease Land CD are arbitrary and capricious and not consistent with law.  The Final CCP/EIS is structured to achieve the waterfowl population objectives set out in Appendix F and described in the Bioenergetics Model.  A fundamental premise of this analysis is that food is the limiting resource affecting waterfowl populations.  Yet, the Tule Lake Lease Land CD and Lower Klamath Lease Land CD require agricultural management practices that limit the ability of lease land farmers to effectively grow grain and other crops on the lease lands.

119.    The Tule Lake Lease Land CD and Lower Klamath Lease Land CD contain stipulations for agriculture on the lease lands that are arbitrary, unsupported, and do not serve the waterfowl purpose or other purposes of the refuge.  The inappropriate stipulations include:

    a.    Flooding of farm lands post-harvest to February 15;

    b.    Interspersion of wetlands and agriculture such that agricultural fields are within one mile of wetland or flooded agricultural habitat;

    c.    Prohibition of field work from post-harvest to February 15, unless authorized by the Refuge Manager;

    d.    Prohibition of hazing of waterfowl from January 1 through April 30 each year, when fields are being tilled and planted;

    e.    Restrictions on post-harvest agricultural practices, including tillage and prescribed burning;

    f.    Presumptive prohibition of genetically modified crops/organisms;

    g.    Restrictions on cutting alfalfa;

      h.    Annual review of the lease land program to evaluate whether farming practices are consistent with the Service's current interpretation of proper waterfowl management; and

      i.    A requirement that Reclamation apply annually for a special use permit (SUP) that will include the stipulations and the prescribed habitat mix based on energetic modeling.

These stipulations in the Tule Lake Lease Land CD and the Lower Klamath Lease Land CD materially interfere with or detract from the waterfowl management purpose of Tule Lake NWR and Lower Klamath NWR by limiting agriculture and the food resources necessary to support the waterfowl populations.

120.    Further, Defendants' determination of consistency or compatibility are not based on fact.  There is no evidence or rational connection in the Tule Lake Lease Land CD, the Lower Klamath Lease Land CD, or the Final CCP/EIS explaining how the stipulations restricting agricultural practices further the waterfowl management purpose of Tule Lake NWR and Lower Klamath NWR or are necessary to achieve compatibility or consistency of agriculture with waterfowl purposes.  This lack of rational connection renders the Tule Lake Lease Land CD and Lower Klamath Lease Land CD arbitrary and capricious.

121.    Under the preferred alternative for agricultural management in Tule Lake NWR, the Service will increase standing (unharvested) grain to 1,500 acres, with half of the standing grain occurring on the lease lands and half occurring on the cooperatively farmed lands.  Under the preferred alternative for agricultural management in Lower Klamath NWR, the Service will increase standing grain to 1,500 acres and revise lease land contracts to require lessees to leave 25 percent of their fields as unharvested grain if this habitat objective cannot be met on the

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF        -36-

cooperative farm lands.  The standing grain objectives for Tule Lake NWR and Lower Klamath NWR detract from the waterfowl purpose of the refuge by trading fall food resources for food resources in the winter months and other times of the year.  Standing grain that is not eaten by waterfowl affects the productivity of the agricultural lands, which in turn affects the ability to grow crops and diminishes lease revenues.

122.    The standing grain requirements in the selected alternatives do not contribute to or achieve the identified vision, goals, objectives, or purposes of Tule Lake NWR or Lower Klamath NWR.  These standing grain requirements are not based on fact and are arbitrary and capricious.

123.    Thus, the Tule Lake Lease Land CD and Lower Klamath Lease Land CD are not in accordance with the Improvement Act and violate 5 U.S.C. § 706.

124.    Defendants' issuance of the Tule Lake Lease Land CD and Lower Klamath Lease Land CD is arbitrary, capricious, an abuse of discretion, and not in accordance with law, and must be set aside.  In the alternative, the Tule Lake Lease Land CD and Lower Klamath Lease Land CD constitute actions in excess of Defendants' statutory jurisdiction or authority.

125.    Defendants' determination of consistency or compatibility are not based on fact, are arbitrary, capricious, an abuse of discretion, and otherwise inconsistent with law, and must be set aside.

126.    Additionally, the standing grain requirements in the selected alternative for Tule Lake NWR and Lower Klamath NWR are not in accordance with the Improvement Act and violate 5 U.S.C. § 706.

127.    Defendants' issuance of the ROD selecting Alternative C for Tule Lake NWR and Lower Klamath NWR is arbitrary, capricious, an abuse of discretion, and not in accordance with

law, and must be set aside.  In the alternative, Defendants' issuance of the ROD selecting Alternative C for Tule Lake NWR and Lower Klamath NWR constitute actions in excess of Defendants' statutory jurisdiction or authority.

128.    Defendants' issuance of the ROD selecting Alternative C for Tule Lake NWR and Lower Klamath NWR is not based on fact, and thus is arbitrary, capricious, an abuse of discretion, and otherwise inconsistent with law, and must be set aside.

## FOURTH CLAIM FOR RELIEF

### (Administrative Procedure Act—NEPA)

129.    Plaintiffs reallege and incorporate by reference paragraphs 1-128 of this Complaint.

130.    NEPA requires federal agencies to rigorously explore and objectively evaluate all reasonable alternatives.  Federal agencies must devote substantial treatment to each alternative considered in detail.

131.    The Final CCP/EIS does not rigorously or clearly discern the proposed alternatives, the necessary actions that the Service proposes to take under each alternative, and how the Service proposes to accomplish the objectives under each alternative.  The descriptions of the alternatives do not include all of the stipulations under the Tule Lake Lease Land CD and the Lower Klamath Lease Land CD.  This description of alternatives is inadequate under the requirements imposed by NEPA.

132.    NEPA requires that federal agencies consider the environmental effects of any proposed action prior to approval of the proposed action.  For any contemplated major federal action which could significantly affect the quality of the human environment, an action agency must prepare an environmental impact statement (EIS).  The EIS must, among other things,

describe the purpose and need for the proposed action, the environmental effects of the proposed action, alternatives to the proposed action, and means by which impacts of the proposed action could be mitigated.

133.    The Final CCP/EIS fails to analyze the direct and indirect adverse environmental effects of the stipulations required in the Tule Lake Lease Land CD and the Lower Klamath Lease Land CD and incorporated into the selected alternative.  The direct and indirect adverse environmental effects of stipulations in the Tule Lake Lease Land CD and the Lower Klamath Lease Land CD may include: loss of food and habitat for migratory waterfowl and other wildlife on the Tule Lake NWR; infestation of noxious weeds and pests on lease lands and neighboring private lands, and attendant and resultant additional environmental effects; impacts to air quality; wind erosion of soils; impacts to water quality; impacts to groundwater; impacts to aquatic organisms and endangered species; impacts to aesthetic and recreational interests; and economic, social, and cultural impacts to persons, local agencies, and communities dependent on the continued viability of farming on the lease lands in Tule Lake NWR and Lower Klamath NWR.

134.    Defendants' failure to adequately describe, explore, and evaluate the proposed alternatives for Tule Lake NWR and Lower Klamath NWR is not in accordance with NEPA and violates 5 U.S.C. § 706.

135.    Defendants' failure to disclose and analyze the direct and indirect adverse environmental effects of the stipulations required in the Tule Lake Lease Land CD and Lower Klamath Lease Land CD and incorporated in the selected alternative in the ROD is not in accordance with NEPA and violates 5 U.S.C. § 706.

136.    Defendants' issuance of the Final CCP/EIS and ROD is arbitrary, capricious, an abuse of discretion, and not in accordance with law, and must be set aside.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief from the Court as follows:

A.      Declare that the Service violated the Kuchel Act by issuing the Final CCP/EIS and ROD;

B.      Declare that the Kuchel Act does not require or authorize a determination of compatibility or consistency as a condition of conducting agricultural leasing of the lease lands, or authorize the imposition of restrictions on the lease lands other than those explicitly enumerated in section 4 of the Kuchel Act;

C.      Declare that the Service violated the Improvement Act by issuing the Final CCP/EIS and ROD;

D.      Declare that agriculture is a purpose of Tule Lake and Lower Klamath NWRs within the meaning of the Improvement Act;

E.      Declare that the Service violated NEPA by issuing the Final CCP/EIS and ROD;

F.      Declare that the Final CCP/EIS is arbitrary, capricious, an abuse of discretion, and not in accordance with law under the APA, in violation of 5 U.S.C. § 706;

G.      Declare that the Service's adoption of the Final CCP/EIS and ROD was in excess of statutory jurisdiction or authority;

H.      Hold unlawful and set aside the Final CCP/EIS and ROD;

I.      Order Defendants to set aside and vacate the Final CCP/EIS and ROD;

J.      Permanently enjoin Defendants from implementing or enforcing the stipulations in the Tule Lake Lease Land CD and Lower Klamath Lease Land CD.

K.      Award Plaintiffs' attorneys' fees authorized by law; and

L.      Award other such relief as the Court deems just and proper.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

SOMACH SIMMONS & DUNN, PC

DATED:  April 3, 2017                    By   s/ Paul S. Simmons
                                         Paul S. Simmons (OSB #971386)
                                         psimmons@somachlaw.com
                                         500 Capitol Mall, Suite 1000
                                         Sacramento, CA 95814
                                         Telephone: (916) 446-7979
                                         Facsimile: (916) 446-8199

                                         Attorneys for Plaintiffs TULELAKE
                                         IRRIGATION DISTRICT; KLAMATH
                                         WATER USERS ASSOCIATION; TALLY HO
                                         FARMS PARTNERSHIP DBA WALKER
                                         BROTHERS; FOUR H ORGANICS, LLC;
                                         WOODHOUSE FARMING AND SEED
                                         COMPANY; and TULELAKE GROWERS
                                         ASSOCIATION